# EXHIBIT "C"

```
 1                          Wider
 2     Do I have an electronic file?  Do I have a telephone
 3     file?  Be specific, Bob.
 4          Q.    Do you have any file?
 5          A.    Yes, I do.
 6          Q.    Tell me the files that you have.
 7          A.    Everything is electronic communications.
 8          Q.    During the lunch break I'm going to ask
 9     that you print out a hard copy of that file and make
10     it available to me so I can question you about this
11     further after the lunch break.
12          A.    Okay.
13          Q.    Are you claiming any damages that have
14     resulted from Nomura Securities or Deutsche Bank
15     being unwilling to purchase loans from HTFC?
16          A.    $50 million, Bob.  Plus interest.  Not
17     including punitive.  Insurmountable.  I like that
18     word.
19          Q.    What is the time period during which
20     Deutsche Bank has refused to purchase loans from
21     HTFC?
22          A.    About a year now.
23          Q.    So starting?
24          A.    I couldn't gave you exact dates.
25          Q.    So sometime in 2006?
```

1                          Wider

2         A.      Yes.

3         Q.      Ending when Deutsche Bank went into

4    bankruptcy?

5         A.      Well, they exited the market.   They

6    imploded.

7         Q.      So during the time period sometime in

8    2006 to when they exited the market which, again, is

9    that sometime in 2006 as well?

10        A.      Yes.

11        Q.      You claim you have been -- HTFC has been

12   damaged -- because during that time period in 2006

13   you could not sell loans to --

14        A.      Deutsche Bank and Nomura Securities,

15   correct.

16        Q.      Let's talk about Deutsche Bank first.

17   With respect to Nomura Securities -- again, the same

18   question -- during what time period do you say that

19   HTFC was unable to sell loans to Nomura Securities?

20        A.      Hold on a second I'll give you exact

21   date.

22              MR. BODZIN:  Go off the record.

23              THE VIDEOGRAPHER:  The time is 11:27

24       and we're going off the record.

25              (Short recess).

1                    Wider

2           THE VIDEOGRAPHER:   The time is 11:28 a.m.

3      and we're back on the record.

4      A.     January 14th.

5      Q.     Of what year?

6      A.     2007.

7      Q.     That is the date when Nomura stopped

8   purchasing loans from you?

9      A.     Correct.

10      Q.     You left the room -- is there something

11   that you looked at that told you that was the date?

12      A.     I've got a huge file.  All my

13   communications with Nomura.  Early payment default

14   claims, communications, purchases.  That was the

15   last date, yes.

16      Q.     So was January 14, 2007 the last date

17   that you were able to sell them a loan?

18      A.     Correct, I got cut off at that date.

19      Q.     When did Nomura stop doing business?

20      A.     They exited the country -- I don't know.

21   March --

22           MR. ZICCARDI:   If you know, don't guess.

23      Q.     March 2007?

24      A.     Maybe.

25      Q.     So with respect to Nomura your claim is

Wider

1

2   that between January 14th of 2007 and approximately

3   March of 2007 you were unable to sell loans to them?

4        A.      Correct.

5        Q.      Now, during the time period from let's

6   say the beginning of 2006 through March of 2007,

7   what other institutions do you have correspondent

8   agreements with?

9        A.      Many, it's on as-need to know basis and

10  you don't need to know.

11       Q.      You need to tell me that.

12       A.      No, I don't.

13       Q.      You need to tell me.

14       A.      Bob, your company --

15       Q.      You need to tell me.

16       A.      Your representation of your company

17  willfully went out and tried to fuck up my life.

18  You don't need to know anything about this company.

19            MR. ZICCARDI:  Let's take a break.

20            MR. BODZIN:  We can take a break but

21       we're not going to do this over and over again.

22       If Mr. Wider simply does not want to answer

23       questions or answers questions in this manner

24       we're not going to have a conference every time

25       it happens.

Wider

1

2         Hopefully, you will be able to speak with

3    him and persuade him that's not an appropriate

4    response to my questions.

5         THE WITNESS:  We're having a conference

6    tomorrow, Bob.  Why don't you get a Motion from

7    the Judge because he's going to give you an ass

8    licking.

9         MR. ZICCARDI:  Let's go.

10        THE WITNESS:  Don't ask questions that

11   have nothing to do with this.

12        THE VIDEOGRAPHER:  The time is 11:31 a.m.

13   and we're off the record.

14        (Short recess).

15        THE VIDEOGRAPHER:  The time is now 11:35

16   a.m. and we're back on the record.

17   Q.     Mr. Wider, what other banks did HTFC have

18   correspondent agreements with in the time period of

19   January 2006 through March of 2007?

20   DI       MR. ZICCARDI:  I'm going to object to

21        that just on the basis, one, that I don't

22        believe it's relevant.  Two, I think it seeks

23        the confidentiality proprietary business

24        information of HTFC which HTFC is not going to

25        disclose.

Wider

1
2          MR. BODZIN:  So you're instructing your
3    witness not to answer the question?
4          MR. ZICCARDI:  He is not going to answer
5    the question.
6          MR. BODZIN:  If the claim of HTFC is that
7    during the time period of January 2006 through
8    March of 2007 it was unable to sell certain
9    loans to Deutsche Bank and Nomura Securities,
10   it is certainly highly relevant and
11   discoverable as to whether or not HTFC had
12   other options for selling loans.
13         If you are instructing the witness not
14   the answer the question; then, we will simply
15   ask the Court to preclude HTFC from seeking
16   damages with respect to that claim.
17         So you may want to reconsider that.
18         MR. ZICCARDI:  You can file whatever
19   Motion you want to file.  The reality,
20   though, is that the confidential information
21   of HTFC following the last deposition there
22   were a number of items that had gotten out and
23   for some reason are now in the press --
24         THE WITNESS:  Identical to your
25   questions.

```
 1                      Wider
 2          MR. ZICCARDI:  -- which are interfering
 3     with HTFC's business so if you want to get a
 4     Motion to compel.
 5          MR. BODZIN:  Are you trying to make some
 6     kind of accusation here?  I would like to hear
 7     what you have to say.
 8          MR. ZICCARDI:  I'm just stating what
 9     happened.
10          MR. BODZIN:  What happened that you are
11     concerned with regard to the subject of this
12     deposition?
13          MR. ZICCARDI:  The information that was
14     given at the last deposition has gotten into
15     the hands of reporters and it certainly hasn't
16     come from us.
17          MR. BODZIN:  It hasn't come from
18     me.
19          MR. ZICCARDI:  I'm not saying it came
20     from  you --
21          THE WITNESS:  Identical.  Your questions
22     were identical questions.  So it had tocome
23     from you, Bob.
24          MR. VOULO:  You can't make that
25     accusation.
```

Wider

1
2          MR. BODZIN:  You're a professional and
3      you're making unfounded accusations.
4          THE WITNESS:  We'll add this to your
5      list.
6          MR. BODZIN:  I'm going on to the next
7      question.
8      Q.    Sir, during the time period of January
9  2006 through March 2007, can you identify any
10  specific loans that you wanted to sell into the
11  market place that you were unable to sell?
12      A.    Hundreds.  How I can identify hundreds?
13      Q.    Identify those loans for me?
14      A.    I don't carry them in my head, Bob.
15      Q.    Where is the information that would
16  describe those loans?
17      A.    Can you spell your name backwards, Bob?
18  That's what you're asking.  Everything is done
19  electronically.  Everything's in files.  Can you
20  spell your name backwards, Bob?  Tell me.
21          MR. BODZIN:  If you want to instruct your
22      client to act in a civilized manner; otherwise,
23      we're going to adjourn this deposition.
24          MR. ZICCARDI:  Take whatever action you
25      want to take.  I mean, he is trying to answer

1                           Wider

2        A.     Nope, it's inconsistent with the deed.

3    It has two addresses on it.   It's says return to 324

4    and at the top says 312.

5        Q.     Was 324 your address in April of 2005?

6        A.     No, it's 312.

7        Q.     If you will now look at pages 1 through 4

8    of Exhibit 47.   It's appears to be a Deed between

9    the Sacaro Trust and John Hatilofsky, Junior dated

10   April 29, 2005 for stated consideration of

11   $750,000.00.   Do you see that?

12       A.     Yes.   What's your point?

13       Q.     I haven't asked you a question yet so?

14       A.     Okay.

15              MR. ZICCARDI:   What was the amount of the

16       transfer?   The last one?

17              MR. BODZIN: $750,000.00.

18              MR. ZICCARDI:   Thanks.

19       Q.     Going back to the Deed between yourself

20   and the Sacaro Trust on April 29, 2005.   What was

21   the purpose of that transaction?

22       A.     That's confidential.   You know the laws

23   of Trusts.

24       Q.     It's not confidential?

25       A.     Yes, it is.

                              Wider

1

2       Q.      What was the purpose of that transaction?

3       A.      None of your business.  That's the law.

4       Q.      What is the Sacaro Trust?

5       A.      None of your business.  Not even a Judge

6  could get me to enforce that?

7       Q.      I see.  So you refuse to answer that

8  question.

9       A.      You'll have to speak to the Judge.

10      Q.      Are you refusing to answer that question,

11 sir?

12      A.      Yes, I am.

13      Q.      The other Deed dated April 29, 2005

14 between the Sacaro Trust and John Hatilofsky,

15 Junior., that's signed by John Petinton, Trustee of

16 the Sacaro Trust?

17      A.      So?

18      Q.      Do you know how John Petinton became the

19 Trustee of the Sacaro Trust?

20      A.      He is a lawyer.  He can do whatever the

21 fuck he wants.

22      Q.      I'm asking you a question.

23      A.      You don't like it -- you don't like my

24 answer -- that is my answer for the record.

25      Q.      My question is --

Wider

A.      I've answered it.

Q.      Do you know how Mr. Petinton came to be the Trustee of the Sacaro Trust?

A.      Isn't the law wonderful?

Q.      Can you answer my question?

A.      That's my answer.

Q.      Sir, I'll ask you again.  Do you know how Mr. Petinton became the Trustee of the Sacaro Trust?

A.      I can't recall.

Q.      Did Mr. Petinton represent, to your knowledge, the Sacaro's as either buyers or sellers of 1004 North Broadway?

A.      Excuse me?

Q.      To your knowledge, did Mr. Petinton as a lawyer represent the Sacaro's as either borrowers or sellers of the property at 1004 North Broadway?

A.      I don't know -- couldn't recall -- ask John.  You will see him tomorrow.

Q.      Did you ever reside at 1004 Broadway?

A.      Can't recall.

Q.      You don't know where you lived?

A.      No, I don't.

Q.      You don't know where you lived?

A.      According to you, I've got psychiatric

1                    Wider

2    issue.  So I can't recall.  You remember that.

3         Q.    Sir, this is November of 2007?

4         A.    That's right.

5         Q.    You don't recall where you lived between

6    2005 and 2006?

7         A.    Well, according to you I've got

8    psychiatric issues since the last deposition.  No,

9    I.

10        Q.    So you don't recall where you've lived.

11   Do you recall ever owning 1004 North Broadway as an

12   investment property?

13        A.    I own thousands of properties.

14        Q.    I'm asking you specifically about 1004?

15        A.    And I just answered your question.  I

16   don't recall owning anything.  I have thousands.  I

17   don't keep track of things like this.

18        Q.    Do you know what the business purpose was

19   of the Sacaro Trust conveying Title to John

20   Hatilofsky, Junior., on April 29, 2005 for

21   $750,000.00?

22        A.    None of your business.  It's a business

23   decision.

24        Q.    You're refusing to answer that question?

25        A.    It's a business decision.  That is my

1                    Wider

2    answer.

3         Q.    Sir --

4         A.    I've answered your question.  It's a

5    business decision.

6         Q.    You're refusing to answer?

7         A.    That is a business decision.  I answered

8    it.

9         Q.    What is the business reason for that?

10        A.    None of your fucking business.  It's a

11   business decision.  It has nothing to do with this

12   case.

13        Q.    Take a look at Exhibit 48 now.

14        A.    Don't need to.

15        Q.    If you will go to the third -- starting

16   with the fifth page of that document --

17        A.    And?

18        Q.    Through the eighth page of that document.

19   You will see that on December 6, 2005 that --

20        A.    What page?

21        Q.    Starting with page 5.

22        A.    Okay.

23        Q.    You will see that on December 6, 2005

24   that Title was conveyed --

25        A.    Wait, I'm missing a page.  This is my

1                          Wider

2     page 6.

3          Q.      Right.   We'll go to the next page.

4          A.      Okay.

5          Q.      You see on December 6, 2005 Title was

6     conveyed from John Hatilofsky, Junior to the

7     Hatilofsky Trust?

8          A.      Right.

9          Q.      And, I assume, you're not going to tell

10    me what you believe to be the purpose of that

11    transaction?

12         A.      This is all law.  You're asking the wrong

13    person.  I don't practice law.

14         Q.      Well, I won't ask you the same question

15    over again because I know what your responses will

16    be but I want to ask you this question:  As of

17    December 6, 2005, did you have a direct or indirect

18    financial interest in 1004 North Broadway?

19         A.      I can't recall.

20         Q.      If the Deed is between John Hatilofsky,

21    Junior., and the Hatilofsky Trust, you would know

22    whether or not you had any type of business

23    relationship with either John Hatilofsky, Junior or

24    the Hatilofsky Trust?  You would know that wouldn't

25    you?

1                    Wider

2        A.    No, I wouldn't.   I own thousands of

3   properties.

4        Q.    Sir, if you take a look at the last page

5   of Exhibit 48 you see that there is a direction that

6   the Deed be returned by mail to GCF Development?

7        A.    And?

8        Q.    Care of 400 Garden City Plaza, Suite 420,

9   Garden City, New York?

10       A.    Your question is.

11       Q.    That's the office of HTFC?

12       A.    Yes.  Also, Groove Radio also.

13       Q.    Do you know why there would have been a

14  direction that the Deed between Mr. Hatilofsky and

15  the Hatilofsky Trust should be returned to GCF

16  Development?

17       A.    Absolutely.

18       Q.    What's the reason?

19       A.    It's a business decision.

20       Q.    So you won't tell me why?

21       A.    None of your fucking business.

22       Q.    You can't tell me the role of GCF

23  Development has in this transaction?

24       A.    No, absolutely not.  Isn't the law

25  wonderful, Bob.

1                    Wider

2        Q.    If you know, take a look at pages 1

3   through 4 of Exhibit 48?

4        A.    Pardon me?

5              MR. VOULO:  Pages 1 through 4.  These

6   four. Front four.

7              THE WITNESS:  Front four?

8              MR. VOULO:  Yes.

9        Q.    You will see on December 29, 2005 the

10  Hatilofsky Trust conveyed 1004 North Broadway to

11  William Fitzgerald and Robin Fitzgerald for

12  $805,000.00?

13       A.    Okay.

14       Q.    Do you know who -- and, again, you'll see

15  on the fourth page that there is a direction that

16  the Deed be returned by mail to GCF Development, do

17  you know why?

18       A.    Yes, we're testing Carlton Cheats

19  program.

20       Q.    I'm sorry?

21       A.    I am testing Carlton Cheats program on

22  TV.

23       Q.    Who is Carlton Cheats program?

24       A.    You don't watch Carlton Cheats on TV? Buy

25  a house.  Rehab a house.  I suggest you watch TV.  I

1                         Wider

2    answered your question.

3         Q.    Why is the direction this Deed be

4    returned to GCF Development testing Carlton Cheats

5    program?

6         A.    Go watch the program and find out.  I'm

7    not here to educate you, Bob.

8         Q.    You don't have an answer to that either?

9         A.    I just answered you.  You don't like the

10   answer.  You might not be able to manipulate me to

11   get an answer but when I tell that's my answer you

12   fucking accept it or don't.

13        Q.    You purchased the property on April 29,

14   2005 for $475,000.00 and between April 29th of 2005

15   and December 29, 2005 it was transferred four times

16   resulting, eventually, in a sale for $805,000.00 to

17   William and Robin Fitzgerald.

18             My question is, sir, did you realize any

19   of the benefit of the difference between $475,000.00

20   and $805,000.00?

21        A.    Sure.

22        Q.    How much?  All of it?

23        A.    Did I realize the benefit?  It went to

24   the borrower.

25        Q.    You bought it for $475,00.00 on April 29,

<pre>
                         Wider
 1
 2    I buy a property for cash I can anything I fucking
 3    what with my money.  I can transfer the Deed 80,000
 4    fucking times whether you like it or not and I don't
 5    have to answer you why I would buy a property and,
 6    then, bring the value of the property up in a
 7    declining market where your company is fucking
 8    falling in it.
 9        Q.    Did you bring the value of this property
10    up over $330,000.00 between April 29, 2005 and
11    December 29, 2005?
12        A.    More than that because the property is a
13    legal two-family.  Your reviewer appraised it as a
14    one-family and my appraiser did it as a one-family.
15    So if you go out and try to find a comparable, you
16    won't be able to find it, it's priceless.
17        Q.    So I thought you weren't familiar with
18    this property?
19        A.    It took sometime.  You know something, I
20    can recall now.
21        Q.    Now, you can recall?
22        A.    Now, I can recall.
23        Q.    Since now you can recall this property,
24    tell me what you did between April 29, 2005 and
25    December 29th of 2005 to enhance the value of this
</pre>

1                    Wider

2    property?

3        A.    None of your fucking business.   None of

4    your fucking business.   I'll say it again.

5        Q.    Did you do any renovations to the

6    property?

7        A.    Go take a look at it.

8        Q.    I'm asking you.

9        A.    Go take a look at it.   You're a lawyer.

10   You go take a look at it.

11       Q.    Did you do any renovations --

12       A.    You go take a look at the property.

13       Q.    Did GCF Development do any work on the

14   property?

15       A.    Go take a look at it.   GCF Development

16   isn't even in the suit so I'm not going to answer

17   the question.

18       Q.    So you're not going to tell me what, if

19   anything, you did to enhance the value of the

20   property during the time period?

21       A.    No, I'm not.

22       Q.    Did you sell this property through a

23   realtor?

24       A.    No.   As a matter of fact, it was actually

25   referred by a friend.   Not a realtor.

1                    Wider

2    front of you for this property?

3         A.    Yes.

4         Q.    What kind of work did the Fitzgerald's

5    do?

6         A.    I don't know.

7         Q.    Take a look.  You underwrote the loan?

8         A.    What page?

9         Q.    It's your loan file.  You should be able

10   to find it.

11        A.    You want something.  You get it yourself.

12        Q.    Sir, I suggest you take that back right

13   now.

14        A.    Get it yourself.

15        Q.    I suggest you take it back yourself.

16        A.    I suggest you shut the fuck up and get it

17   yourself.  You want something.  You want to look at

18   it.

19        Q.    According to your loan file, what does

20   Mr. and Mrs. Fitzgerald do?

21        A.    Find it.

22        Q.    This is your loan file --

23        A.    We're going to go round in circles, my

24   friend.

25        Q.    -- this is your loan file, what do

<pre>
                           Wider
 1
 2    Mr. and Mrs. Fitzgerald do for a living?
 3         A.    I don't know.  Open it up and find it.
 4         Q.    Look at your loan file and tell me.
 5         A.    Open it up and do it.  I'm not your
 6    fucking bitch.
 7         Q.    Take a look at your loan application?
 8         A.    Do it yourself.  Do it yourself.  You
 9    want to do this in front of a Judge.  Would you
10    prefer to this in front of a Judge?  Then, shut the
11    fuck up.
12         Q.    Sir, take a look --
13         A.    I'm taking a break.  Fuck him.  You open
14    up the document.  You want me to look at something,
15    you get the document out.  Earn your fucking money
16    asshole.  Isn't the law wonderful.  Better get used
17    to it.  You'll retire when I'm done.
18              THE VIDEOGRAPHER:  The time is 2:11 p.m.
19         and we're going off the record.
20              (Short recess).
21              THE VIDEOGRAPHER:  The time is 2:17 p.m.
22         we're back on the record.
23         Q.    What underwrote this loan for HTFC?
24         A.    You have it in your hands.  I don't know.
25         Q.    I'm asking you to take a look at the file
</pre>

1                        Wider

2    and tell me who underwrote this loan?

3         A.    It's right there in your hands.  Show it

4    to me.

5         Q.    I'm asking you to look at the file.

6         A.    I'm not looking at the file.  You have

7    the document that's in your hand right now.  I'm not

8    going fishing through a file.  We'll be here all

9    day, Bob.

10        Q.    It's your file.

11        A.    I'm not looking through the file.  Open

12   it up and show it to me.

13        Q.    If you don't want to answer tell me and

14   we'll move on to something else.

15        A.    Okay, we'll move on to something else.

16        Q.    What did Mr. and Mrs. Fitzgerald do for a

17   living at the time this loan was --

18        A.    You tell me, Bob; it's in your hands.

19        Q.    I'm asking you.  Tell me based upon

20   what's in your file.

21        A.    I don't know.  Open it up and show me.

22             MR. ZICCARDI:  Aaron, look at document

23        291.

24             THE WITNESS:  If Bob would give me the

25        number I don't wanted to go fishing through it.

1                         Wider

2        Q.      You listed her income as being base

3  income $9,000.00 a month?

4        A.      Stated income.

5        Q.      $9,000.00 a month?

6        A.      Stated income, that's correct.

7        Q.      What does that come out to a year?   A

8  $108,000.00 a year?

9        A.      Yup.

10       Q.      Did that seem to be somewhat high to you

11  for a legal secretary in 2006?

12            MR. ZICCARDI:   Objection; calls for

13       speculation.   No foundation, but you can

14       answer.

15       A.      I refuse to answer.

16       Q.      Why do you refuse to answer?

17       A.      My attorney said no.

18       Q.      Your attorney didn't tell you you can't

19  answer.

20       A.      My attorney just said no.   Shut up and

21  keep moving.

22       Q.      Excuse me?

23       A.      Shut up and keep moving.

24            MR. ZICCARDI:   You can answer if you

25       know.

```
1                        Wider
2               THE WITNESS:  I'm not answering.
3               MR. ZICCARDI:  If you know, you can
4          answer.
5          A.    No, it's not high.  It's actually very,
6     very low.  My secretary in here gets paid
7     $175,000.00 a year.  Salary.com -- we use Salary.com
8     for stated income.  Limo drivers make tips.
9          Q.    I'm not asking about limo drivers.
10         A.    For Salary.com it's about average.  She
11    is a legal secretary?
12         Q.    The average salary for a legal secretary
13    in New York was $108,000.00 a year?
14              MR. ZICCARDI:  Same objection.
15         A.    About $90,000.00 to $120,000 is about
16    fair.
17         Q.    For a limo driver $7500.00 a month?
18         A.    That's understated.  Guys make $5600.00
19    night in tips and these driver's only work one or
20    two days a week.
21         Q.    This gentleman had been employed as a
22    limo driver for how long?
23         A.    One month.  So that's actually 17
24    years --
25         Q.    17 years he's been employed as a truck
```

Wider

2  for $3.00, that's not inflation.  That's not

3  powerful inflation.  Just because I go out and buy

4  this paperclip for 50 cents and I sell it on the

5  retail market for a dollar doesn't mean I

6  artificially inflated.  Everything is artificially

7  inflated.

8      Q.    Now, you've already refused to answer the

9  questions about the purpose for the four transfers

10  of Title between April 2005 and December 2005.  I'm

11  not going to ask you about that --

12     A.    I'm not refusing.  It's an inside trade

13  secret and it's related to law and if you can't see

14  it I'm not here to educate you.  It's a million

15  dollars.  A million dollars.  That's my response.

16     Q.    Please allow me to finish my question.

17  My question is there are two different Trusts

18  involved in these four transfers.

19         One is the John Hatilofsky Trust and the

20  other is the Sacaro Trust and in both Trusts

21  Mr. John Petinton is the Trustee of both Trusts.

22  Based upon that information, can you tell me that

23  you were not involved in directing this

24  transactions?

25     A.    I cannot recall.  I'm involved with

Wider

2 thousands of transactions.

3     Q.    Is it just a coincidence Mr. Petinton was

4 involved as the Trustee in connection with both of

5 those Trusts?

6     A.    It's not a coincidence that I'm a genius

7 at what I do.  I obey the law and live the law.  You

8 practice the law.  Sir, I'm not going to be

9 interrupted while I am speaking.  I live the law.

10 You serve the law.  You practice the law.  I abide

11 by the law and enforce the law to the fullest extent

12 the law allows.

13          The only difference between you and I is

14 I have a pair of balls and you don't.  The only

15 difference between the average person is I have a

16 pair of balls and they don't.  You think it's funny.

17 I'm not the one chasing $15 million dollars ass

18 wipe.

19     Q.    Sir, as a self-proclaimed genius that you

20 are, is it correct that you directed          Mr.

21 Petinton to form these Trusts and, then, directed

22 the transfer of Title that has been described in the

23 Deeds that you just described?

24     A.    Do you have a habit to try and lead

25 someone who is not a witness before we even walk

1                          Wider

2    into a courtroom?

3        Q.    Sir, answer my question.

4        A.    I just did.

5              MR. BODZIN:  Can you read back my

6              question.

7              I'll ask it again.

8        Q.    Did you direct Mr. Petinton to create the

9    John Hatilofsky Trust and the Sacaro Trust and to

10   document the transactions that are described in the

11   Title reports marked as Exhibit 47 and Exhibit 48?

12       A.    Are you manufacturing a question or are

13   you asking a question?  What is it?

14       Q.    Do you want to answer the question?

15       A.    I just did.  You will have to be more

16   specific, Bob.  I can't hear you.

17       Q.    Did you direct Mr. Petinton to create the

18   Trust and draft the Deeds reflected in Exhibit 47

19   and 48?

20       A.    I can't recall.

21       Q.    If Mr. Petinton were to testify that was

22   true, would you have any basis for denying it?

23       A.    Mr. Petinton won't testify because he is

24   the Trustee and he cannot.  He cannot ever divulge

25   who the beneficiary is.

1                    Wider

2        Q.    So you want to hide behind some claimed

3    confidentiality you think there is because

4    Mr. Petinton is the Trustee and you're the

5    beneficiary?

6        A.    You'll find out.

7        Q.    Is that what you're trying to do?

8        A.    No.

9        Q.    Who are the beneficiaries of these

10   Trusts?

11             MR. VOULO:   Objection; no foundation.

12       A.    My lawyer.

13       Q.    Who are the beneficiaries?

14       A.    I refuse to answer you.

15       Q.    Why?

16       A.    My attorney said no.

17       Q.    Who are the beneficiaries?

18       A.    None of your fucking business.

19       Q.    Are you the beneficiary of all of these

20   Trusts?

21       A.    I can't recall.

22       Q.    Well, sir, you would know that, wouldn't

23   you?

24       A.    Doesn't make a difference.

25       Q.    Sir, how did you get the money that

                              Wider

2    accounted for the appreciation in 1004 North

3    Broadway because of your great genius?

4         A.    That's right.

5         Q.    How did you get the money?

6         A.    Very simple.  I own a radio station.  40

7    million listeners.

8         Q.    How did you get the money between the

9    price you paid of $475,000.00 and the price that it

10   was sold to the Fitzgerald's of $805,000.00?  Didn't

11   you get the money out through those Trusts?

12        A.    No.  Isn't the law wonderful, Bob?

13              (Exhibit 49, Document Law Office of Eric

14        S. Finger, marked for identification, as of

15        this date.)

16        Q.    You know Mr. Finger?

17        A.    No.

18        Q.    You don't know him?

19        A.    Mr. Finger or Eric Finger?

20        Q.    Are you trying to be cute?

21        A.    Yes, I am cute.  Be specific, Bob.  From

22   now on be specific and detailed.

23        Q.    Do you know a lawyer by the name of Eric

24   S. Finger?

25        A.    Much better.  Yes, I do.

Wider

1

2      Q.      Did Eric S. Finger act as the closing

3  agent on the New York loans that are the subject of

4  this lawsuit?

5      A.      Possibly.

6      Q.      Well, I will represent to you he did and

7  that I served Mr. Finger with a Subpoena for all of

8  the records of the closings on those loans,

9  including the records of payment and disbursements?

10      A.      And you're shooting blanks.

11      Q.      Are you very pleased with yourself, sir?

12      A.      Yes, I am.

13      Q.      Because your trying to perpetrate a fraud

14  and hide it?

15      A.      Go fuck yourself, Bob.  Now, you're going

16  to have to wait.

17      Q.      Sir, if you keep walking out?

18      A.      Shut the fuck up.

19      Q.      Here we ago again?

20      A.      I have a business to run.

21      Q.      You don't have a business to run.  You

22  have a deposition.

23      A.      Shut the fuck up.  Don't tell me what to

24  do.  You sit there.  You're on the payroll.  You can

25  sit there and juice your client, you're not juicing

1                          Wider

2    me.

3         Q.    This happens one more time, we're done.

4         A.    Go ahead.  Go to a fucking Judge.  Shut

5    the fuck up.

6         Q.    I will go to the judge.  Let's stay on

7    the record.  You know, this is not fair to anybody.

8    This is not fair to anybody.  You are rude.

9         A.    Shut up.

10        Q.    You are disrespectful?

11        A.    Shut the fuck up.

12        Q.    There is a woman in this room.  You're

13   totally inappropriate.  It's unfair to the Court

14   Reporter.

15        A.    Are you retained counsel?  Then, shut the

16   fuck up.

17        Q.    Now, I'm a human being --

18        A.    Then, shut the fuck up.

19        Q.    And you have a hard time comprehending.

20   We're going to adjourn this deposition if this

21   happens again because you are offending every single

22   person.

23        A.    Don't speak for anybody in here except

24   yourself fuck face.

25        Q.    I'm speaking for myself and I'm speaking

                        Wider

for the Court Reporter.

     A.     If she had a problem with me she would

say something.  She knows it's directed towards her.

It's directed to you because you're a piece of shit

and a piece of garbage and I'm the only person in

your life that is fucking up your world and I enjoy

it.  I enjoy it and when you sit there and say I'm

perpetrating a fraud I'm just better at the law than

you are and you can't get in the fucking door and

it's pissing you off.  Keep trying.

     Q.     Are you done?

     A.     No, I'm not.  I'm going to keep going.

I'll have you flying in and out of New York City

every single month and this will go on for years.

And, by the way, along the way GMAC will be bankrupt

along the way and I will laugh at you.

     Q.     Are you done?

     A.     No I'm not.

     Q.     What else do you have to say?

          MR. VOULO:  Let's answer the questions.

          THE WITNESS:  Okay.

     Q.     You have in front of you what has been

marked as Exhibit 49 which is a letter Mr. Finger

sent to me on November 2nd 2007 in response to the

1                          Wider

2      to any buyers and borrowers involved in your loan

3      transaction?

4           A.     Excuse me?

5           Q.     Have you referred Mr. Petinton as a

6      lawyer for the borrowers in any of your loan

7      transactions?

8           A.     Mr. Petinton doesn't practice law.

9           Q.     My question is --

10          A.     I just told you he does not practice law.

11          Q.     So your answer is no?

12          A.     Correct.

13          Q.     Now, on any of the properties that are

14     the subject of this lawsuit where you personally

15     were either the borrower or at one point in time

16     owned the property involved, did Mr. Petinton

17     represent you as a lawyer in any of those

18     transactions?

19          A.     Can't recall.  Might have personally as

20     Aaron Wider.  Not as the bank -- possibly.

21          Q.     If he did, did you compensate for that

22     representation?

23          A.     No.

24          Q.     Have you spoken to Mr. Petinton about the

25     Subpoena he received for documents?

1                        Wider

2        A.      He mentioned to me.  He laughed at you.

3        Q.      What did he say?

4        A.      He thought you were a joke.

5        Q.      What else did he say?

6        A.      That you're a joke.

7        Q.      Did he say he had documents responsive to

8    the Subpoena?

9        A.      He had no documents.  He doesn't discuss

10   things with me.  He just said you're a joke.

11       Q.      That's what he said?

12       A.      Yes.

13       Q.      So he shares your opinion on these things

14   as well?

15       A.      Yes, you're a joke.

16       Q.      Did he ask you whether you had any of the

17   documents that were sought in the Subpoena?

18       A.      Why would he do that?

19       Q.      I'm just asking if he asked you that.

20       A.      Why would he do that?

21       Q.      I'm asking you whether he asked you that

22   question?

23       A.      Why would he do that?

24       Q.      I'm asking you if he did that.

25       A.      Why would he do that?

```
 1                        Wider
 2        Q.    Sir --
 3              MR. ZICCARDI:  Just yes or no.
 4        Q.    Yes or no, did he ask you if you had any
 5   documents?
 6        A.    Shut the fuck up.  Don't raise your voice
 7   to me.
 8              MR. BODZIN:  We're adjourning this
 9         deposition.
10              THE WITNESS:  Good.
11              MR. BODZIN:  We're adjourning this
12         deposition.  We're going back to the Judge.
13         We're going to let the Judge decide if this was
14         appropriate way for anybody to behave at a
15              deposition.  I'm not going to continue.
16              THE WITNESS:  You don't point your
17         fucking fingers at me.  You don't raise your
18         fucking voice at me.  And I'm going to spit
19         right back at you.
20              MR. BODZIN:  I'm not going to continue to
21         subject to this harassment, this rudeness
22         absolutely inappropriate conduct and I'm going
23         to adjourn this deposition right now.
24              THE WITNESS:  Good.
25              MR. BODZIN:  See you tomorrow.
```